THIS OPINION IS A
PRECEDENT OF THE
TTAB

Hearing: July 12, 2018          Mailed: December 31, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*TiVo Brands LLC*

*v.*

*Tivoli, LLC*

———

Opposition Nos. 91221632 and 91227791[1]

———

Anne H. Peck, John Paul Oleksiuk, and Timothy D. Hance of Cooley LLP,
    for TiVo Brands LLC.

Nicholas D. Myers of the Myers Law Group,
    for Tivoli, LLC.

———

Before Zervas, Wolfson, and Pologeorgis,
    Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

---

[1] By order dated May 19, 2016, the Board consolidated the two proceedings. 16 TTABVUE. Record citations are to the downloadable .pdf version of TTABVUE records (the Trademark Trial and Appeal Board's publically available docket history system) in Opposition No. 91221632, the parent case in this proceeding.

On July 1, 2014, Tivoli, LLC ("Applicant") applied to register TIVOTAPE (in standard characters) for "electric lighting fixtures" in International Class 11,[2] and on March 3, 2016, Applicant applied to register TIVOBAR (in standard characters) for

> Lighting fixtures; Electric lighting fixtures; LED (light emitting diode) lighting fixtures; LED (light emitting diodes) lighting fixtures for use in display, commercial, industrial, residential, and architectural accent lighting applications; LED light assemblies for street lights, signs, commercial lighting, automobiles, buildings, and other architectural uses; LED light strips for decorative purposes; LED lighting fixtures for indoor and outdoor lighting applications

in International Class 11.[3]

On April 22, 2015, TiVo Brands LLC ("Opposer") filed an opposition to the registration of Applicant's TIVOTAPE mark. On May 10, 2016, Opposer filed an opposition to registration of Applicant's TIVOBAR mark. The notices of opposition allege dilution by blurring under Trademark Act Section 43(c), 15 U.S.C. § 1125(c), and a likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), with Opposer's TIVO and TIVO-formative marks based on prior common law rights acquired through use, and ownership of the following pleaded registrations:[4]

1. **TIVO**    Reg. No. 2423757 issued January 23, 2001; renewed, for

> Computer hardware, computer software for use in connection with personalized, interactive, television

---

[2] Serial No. 86326210. The application alleges Applicant's first use and first use in commerce of the mark on May 30, 2010.

[3] Serial No. 86928527. The application alleges Applicant's first use and first use in commerce of the mark on September 21, 2015.

[4] In the pleaded registrations for the word marks TIVO, TIVO CENTRAL, and TIVO ROAMIO, the marks are registered in typed form or in standard characters. *See* 37 C.F.R. § 2.52(a).

programming; computer peripherals; television peripheral remote controls, and controls, namely, video game interactive remote control units and computer game software for use therewith and accompanying manuals sold as a unit, in International Class 9;

Promoting the sale of goods and services of others through the distribution of on-line promotional material and promotional contests, in International Class 35;

Subscription television broadcasting services; transmission of cable television and interactive audio and video services; and cable television transmission of personalized and interactive television programming, in International Class 38;

Entertainment services, namely, personalized and interactive entertainment services in the nature of providing personalized television programming, and interactive television programming and games, and entertainment information, namely, an online guide to personalized and interactive television programming, in International Class 41.

2. **TIVO CENTRAL** Reg. No. 2436483 issued March 20, 2001; renewed, for

Entertainment services, providing on screen, interactive guide for selecting, administering and maintaining personalized television programming, in International Class 41.



3. Reg. No. 2566471 issued May 07, 2002; renewed, for

Computer hardware, software and peripherals for personalized, interactive television programming; television remote controls; communication devices, namely, transmitters for television; receivers for audio, and video; and software for use therewith; and accompanying manuals sold as a unit, in International Class 9;

Promotion of goods and services of others through the distribution of on-line promotional material and

promotional contests; data processing services, in International Class 35;

Subscription television broadcasting services; transmission of cable television and interactive audio and video services; personalized and interactive television transmission services, in International Class 38;

Entertainment services, namely interactive entertainment services in the nature of providing personalized television programming; and entertainment information, namely an on-line guide to guide to personalized and interactive television programming, in International Class 41.

4. **TIVO**     Reg. No. 2642755 issued October 29, 2002; renewed, for

Shirts, sweatshirts, t-shirts, jerseys, baseball caps, in International Class 25;

Plush toys, and collectable toy figures, in International Class 28;

Retail store services and telephone, and online ordering services featuring digital video recorders and related accessories, installation and viewer guides, shirts, sweatshirts, t-shirts, jerseys, baseball caps, plush toys, collectable toy figures, mugs, antenna covers and blankets, in International Class 35.

5. **TIVO**     Reg. No. 3983234 issued June 28, 2011; §§ 8/15 affidavit accepted and acknowledged, for

Provision of customized entertainment, education and entertainment information in the nature of radio and television programming and distribution of radio programs, television programs and movies for others; entertainment services, namely, providing a web site featuring non-downloadable musical performances, musical videos, television programs, and movies; entertainment and education services, namely, provision of an interactive guide for searching, selecting, and managing radio, television, movies, videos, music, games, images and multimedia content, in International Class 41.

6. **TIVO**     Reg. No. 3821425 issued July 20, 2010; §§ 8/15 affidavit accepted and acknowledged, for

Television broadcasting services; Transmission of network and satellite television programming; Digital and electronic transmission of voice, data, sound, music, graphics, images, audio, video, information, and messages, in International Class 38.

7. **TIVO**    Reg. No. 3902808 issued January 11, 2011; §§ 8/15 affidavit accepted and acknowledged, for "Advertising services" in International Class 35.

8. **TIVO ROAMIO** Reg. No. 4820459 issued September 29, 2015, for

Computer hardware; computer software for use in allowing individual consumers to select, record, view, stream, manage and store a range of multimedia content, namely, television programming, video on-demand programming, music programming, and voice, data, sound, music, graphics, images, audio, video, information, and message content available on the internet or transmitted between users; computer peripherals; remote controls for apparatus for receiving, transmitting, storing and managing audio, video and other digital media; apparatus for receiving, transmitting, storing and managing audio, video and other digital media; software for use with apparatus for receiving, transmitting, storing and managing audio, video and other digital media; digital video recorders; parts and fittings for use with all the aforesaid goods; manuals sold as a unit with all the aforesaid goods; downloadable music; downloadable films and television programs featuring music, text, video, games, comedy, drama, action, adventure, animation, or matters of general interest provided via a video-on-demand service, in International Class 9.

9. **TIVO**    Reg. No. 4713517 issued March 31, 2015, for

Market research services; advertising research services; consumer purchase and behavior research services; media research services, namely, providing an Internet-based database in the field of consumer audience viewership, advertising sales effectiveness, and selection of media to optimize sales results, in International Class 35.[5]

---

[5] Opposer did not plead a family of marks.

In both oppositions, Applicant denied the salient allegations of the notices of opposition and asserted the affirmative defenses of failure to state a claim upon which relief can be granted, laches, equitable estoppel, acquiescence, and abandonment.[6] Applicant further asserted a prior registration defense under *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 160 USPQ 715, 717 (CCPA 1969).[7] However, Applicant did not pursue its alleged affirmative defenses at trial or argue them in its brief; they have been waived and will be given no further consideration.[8] *See Joel Gott Wines LLC v. Rehoboth Von Gott Inc.*, 107 USPQ2d 1424, 1426 n.3 (TTAB 2013); *Miller v. Miller*, 105 USPQ2d 1615, 1616 n.3 (TTAB 2013); *Baroness Small Estates Inc. v. Am. Wine Trade Inc.*, 104 USPQ2d 1224, 1225 n.2 (TTAB 2012).

---

[6] 4 TTABVUE 5-7. Applicant's allegation that Opposer has failed to state a claim upon which relief may be granted is not a true affirmative defense because it relates to an assertion of the insufficiency of the pleading of Opposer's claims rather than a statement of a defense to a properly pleaded claim. *Compare* Fed. R. Civ. P. 12(b)(6) *with* Fed. R. Civ. P. 8(b); *see also Hornblower & Weeks Inc. v. Hornblower & Weeks Inc.*, 60 USPQ2d 1733, 1738 n.7 (TTAB 2001). Further, Applicant's allegations that Opposer's marks are not famous or impaired by Applicant's use of its marks are not construed as affirmative defenses but as amplifications of its denials of the salient allegations relating to Trademark Act § 43(c) in the Notices of Opposition.

[7] Applicant relies upon its prior registrations for the marks TIVOLI, TIVOLED, TIVOFLEX and TIVOLITE for lighting fixtures, controllers, and LED (light-emitting diode) lights, as well as its common law rights, relying on its online advertising, in the marks TIVOFLUTE, TIVOFLEX, TIVOCOVE, TIVOCUE, and TIVOGRAZE. The registrations are discussed more fully infra in regard to Applicant's assertion that Opposer should be required to establish fame of its TIVO mark by August 11, 1972. Reliance on the registrations in support of the *Morehouse* defense is, as noted, considered waived.

[8] Further, laches does not apply where, as here, an opposition has been timely filed. *Nat'l Cable Television Ass'n Inc. v. Am. Cinema Editors Inc.*, 937 F.2d 1572, 19 USPQ2d 1424, 1432 (Fed. Cir. 1991) ("[L]aches begins to run from the time action could be taken against the acquisition by another of a set of rights to which objection is later made. … Thus, in this case laches, with respect to protesting the issuance of the registration for the mark, could not possibly start to run prior to October 16, 1984, when Cable's application for registration was published for opposition.").

Both parties filed briefs, and Opposer filed a reply brief. An oral hearing was held on July 12, 2018. We sustain the oppositions under Trademark Act § 43(c).

## I. The Record

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the application files for Applicant's marks TIVOTAPE and TIVOBAR.

Opposer submitted the following evidence and testimony:

A. Declaration of Kristen Harrall, Opposer's director of corporate branding, and accompanying Exhibits A and B.[9]

B. Notice of Reliance on its pleaded registrations showing current status and Opposer's ownership thereof.[10]

C. Notice of Reliance on printed publications.[11]

D. Notice of Reliance on Fed. R. Civ. P. 30(b)(6) deposition of Applicant's financial controller, Nigel Coppins, and accompanying Exhibits 1-4.[12]

E. Notice of Reliance on deposition of Applicant's international sales manager, Guillermo Briseno, and accompanying Exhibits 1-4.[13]

F. Notice of Reliance on Applicant's Responses to Opposer's Requests for Admissions, Sets One and Two.[14]

---

[9] 27 TTABVUE; continuation of Exhibit B at 28 TTABVUE.

[10] 23 TTABVUE.

[11] 24 TTABVUE.

[12] 25 TTABVUE.

[13] 26 TTABVUE.

[14] 29 TTABVUE. Only admissions to a request for admissions may be made of record by notice of reliance. Accordingly, Opposer's denials have not been considered. Trademark Rule 2.120(k)(3)(i), 37 CFR § 2.120(k)(3)(i).

G. Notice of Reliance on Applicant's Responses to Opposer's Interrogatories, Sets One and Two.[15]

H. Notice of Reliance on documents produced by Applicant during discovery, the authenticity of which was stipulated to by the parties.[16]

Applicant submitted the following evidence and testimony:

A. Notice of Reliance on Applicant's certificates for its existing registrations.[17]

B. Notice of Reliance on third-party registration certificates.[18]

C. Notice of Reliance on Fed. R. Civ. P. 30(b)(6) deposition of Opposer's director of creative services, David J. Keane, and accompanying Exhibits 1-12.[19]

D. Notice of Reliance on Applicant's Internet webpages at www.tivolilighting.com.[20]

E. Notice of Reliance on Opposer's Responses to Applicant's Request for Admissions, Sets One, Two and Three.[21]

F. Notice of Reliance on Opposer's Responses to Applicant's Interrogatories, Sets One and Two.[22]

G. Notice of Reliance on documents produced by Opposer during discovery, the authenticity of which was stipulated to by the parties.[23]

---

[15] 30 TTABVUE.

[16] 31 TTABVUE.

[17] 33 TTABVUE.

[18] 34 TTABVUE.

[19] 41 TTABVUE (confidential version at 35 TTABVUE).

[20] 36 TTABVUE.

[21] 37 TTABVUE. Again, only the admissions have been considered; denials to requests for admissions may not be made of record under a notice of reliance.

[22] 38 TTABVUE.

[23] 39 TTABVUE.

## II.    The Parties

In 1999, Opposer pioneered the creation and development of the "first ever 'digital video recorder' (or 'DVR'),"[24] a digital hardware device that records entertainment for playback on television systems; "it is similar to a videocassette recorder except that a DVR uses internal hard drive storage."[25] Opposer shipped its first DVR in March 1999 and has continuously used the mark TIVO in connection therewith.[26] Opposer asserts that it also provides related services such as "ad sales analytics, promotional analytics, data services, operator services, and advertising services,"[27] but our focus is on the TIVO DVR product and the registrations with identifications that encompass such, inasmuch as this is the product for which the mark TIVO has allegedly become famous.[28] As discussed more fully below, by 2010, TIVO was recognized as a household brand name for DVR players.

Turning to Applicant, it has been in the lighting business since 1972.[29] Applicant's founder established the company after a visit to the Tivoli Gardens in Copenhagen, which Applicant's financial controller, Nigel Coppins, explained "is famous around the world with regard to a lot of light out in the landscape. [Applicant's founder] was

---

[24] Harrall Decl., 27 TTABVUE 2.

[25] *Id*. at 2-3.

[26] *Id.*

[27] *Id.*

[28] Registration Nos. 2423757 and 2566471 for, respectively, TIVO and the TIVO design mark, as well as Reg. No. 4820459 for the TIVO ROAMIO mark. The identifications in all three of these registrations encompass the DVR product.

[29] Coppins Dep., 25 TTABVUE 23.

taken with the effect of all these lights, and came back and said: I want to see if I can make those. And started the company, and called it Tivoli."[30] There are two parts to Applicant's business:

> One is commercial lighting, selling lighting to commercial establishments, office buildings, shopping centers, hotels, restaurant[s], bars, casinos, which we all lump together as commercial. Then we have a theater business, which is a theater auditorium business where we sell primarily step lighting and floor lighting in movie theaters.[31]

As noted supra, Applicant owns registrations for the marks TIVOLI, TIVOLED, TIVOFLEX and TIVOLITE for lighting fixtures, controllers, and LED (light-emitting diode) lights.[32] Applicant further asserts common law rights in the marks TIVOFLUTE, TIVOFLEX, TIVOCOVE, TIVOCUE, and TIVOGRAZE for lighting goods.[33] Some of the marks include wording that references the type of lighting sold under the mark; for example, TIVOFLEX lighting is flexible lighting.[34] As for the involved applications, TIVOTAPE lighting fixtures are "tape lighting," a lighting product in the form of tape.[35] TIVOBAR identifies "a product we licensed from another vendor for sale into … movie theaters [which] is in the shape of a bar."[36]

---

[30] *Id.*

[31] *Id.* at 27.

[32] Registration certificates and TSDR printouts submitted under Notice of Reliance at 33 TTABVUE.

[33] Mr. Briseno testified that all but the TIVOFLEX mark are still in use. 26 TTABVUE 27.

[34] Briseno Dep., 26 TTABVUE 30.

[35] Coppins Dep., 25 TTABVUE 30.

[36] 25 TTABVUE 29.

Applicant first used the TIVOTAPE mark for tape light on May 30, 2010.[37] Applicant first used its TIVOBAR mark on September 21, 2015.[38]

## III. Standing

To have standing, a plaintiff must have a real interest, i.e., a personal stake in the outcome of the proceeding and a reasonable basis for its belief that it will be damaged. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025-28 (Fed. Cir. 1999). As a result of Opposer's submission of copies of TSDR printouts of Opposer's pleaded registrations, showing the current status of and title to the registrations,[39] Opposer has established its standing. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

---

[37] Applicant's Response to Opposer's Interrogatory No 2, Set One, 20 TTABVUE 10.

[38] According to Nigel Coppins, whose deposition was taken on April 29, 2016, Applicant began selling TIVOBAR products "[b]etween one and two years ago." *Id.* at 34. However, the application for the mark asserts September 21, 2015 as Applicant's date of first use of its TIVOBAR mark. To prove a date of first use of a mark that is earlier than the date stated in an application, the applicant must provide clear and convincing evidence. *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1036 (TTAB 2010); 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:52 (5th ed. 2018 update). Mr. Coppins' testimony is not clear and convincing evidence of an earlier date of first use. While the September 21, 2015 date is unsupported by testimony, it is weakly corroborated by the copies of Applicant's installation instructions for TIVOBAR lighting, filed under Notice of Reliance, which bear a 2015 copyright notice and the notation "09.21.15." 36 TTABVUE 398. Standing alone, this evidence would not prove Applicant's first use date, but we note the parties do not dispute this date. Opposer has referred to it in its brief as Applicant's claimed first use date. Accordingly, we accept September 21, 2015 as the date Applicant first used its TIVOBAR mark. We note, however, that inasmuch as we find that Opposer's mark TIVO was famous by 2010 and remained so at trial, whether Applicant first used TIVOBAR in 2014 or 2015 (or not until the filing of its application in 2016) is immaterial.

[39] 23 TTABVUE.

## IV. Dilution

The Trademark Act provides for a cause of action for the dilution of famous and distinctive marks:

> [T]he owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Section 43(c)(1), 15 U.S.C. § 1125(c)(1). Section 13(a), 15 U.S.C. § 1063(a), makes dilution by blurring or tarnishment under Section 43(c) a basis for opposing registration.

A successful claim for federal trademark dilution by blurring under Section 43(c) of the Trademark Act requires that a plaintiff plead and prove the following in a Board proceeding:

1. Plaintiff owns a famous mark that is distinctive;

2. Defendant is using a mark in commerce that allegedly dilutes plaintiff's famous mark;

3. Defendant's use of its mark began after plaintiff's mark became famous; and

4. Defendant's use of its mark is likely to cause dilution by blurring.

*Nike, Inc. v. Palm Beach Crossfit Inc.*, 116 USPQ2d 1025 (TTAB 2015) (citing *Coach Servs. Inc. v. Triumph Learning LLC*, 101 USPQ2d 1713, 1723-24 (Fed. Cir. 2012)).

As an initial matter with respect to Opposer's dilution claim, we point out that in the notices of opposition Opposer refers collectively to the marks it believes are famous as the "TIVO Marks." This same reference is used by Opposer in its brief to mean all of its pleaded marks. We have narrowed our consideration of the dilution claim to the mark that we believe stands the best chance of serving as a basis for its dilution claim. Specifically, we focus our attention on Opposer's use and registration of the mark TIVO, both with and without the design element, for the DVR product because this is the product for which the mark TIVO name has allegedly become famous. If dilution of these TIVO marks by Applicant's TIVOTAPE and TIVOBAR marks is established, there is no need for us to consider whether Applicant's marks would dilute Opposer's TIVO marks for services or for goods such as clothing. On the other hand, we recognize that Opposer's use and registration of the mark TIVO and TIVO-derivative marks for services and other goods may strengthen Opposer's claim that its mark TIVO is famous. However, if Applicant's marks would not dilute Opposer's TIVO marks for the DVR product, then neither would Applicant's marks dilute Opposer's other pleaded marks. *Cf. N. Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1225 (TTAB 2015) (citing *In re Max Capital Grp. Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010)). We now address the dilution factors set out in Section 43(c)(1).

A.    IS TIVO A FAMOUS MARK FOR DILUTION PURPOSES?

The fame that must attach to a mark for it to be eligible for protection under the dilution provisions of the Trademark Act is greater than that which qualifies a mark

as famous for the *du Pont*[40] analysis of likelihood of confusion. *See Coach Servs.*, 101 USPQ2d at 1724 ("Fame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing."); *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). An opposer must show that, when the general public encounters the mark 'in almost any context, it associates the term, at least initially, with the mark's owner.' *Coach Servs.*, 101 USPQ2d at 1725 (quoting *Toro Co. v. ToroHead Inc.*, 61 USPQ2d 1164, 1180-81 (TTAB 2001)). In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Trademark Act § 1125(c)(2)(A); 15 U.S.C. § 1125(c)(2)(A).

### 1. DURATION, EXTENT, AND GEOGRAPHIC REACH OF ADVERTISING AND PUBLICITY OF THE MARK.

The record is sparse with respect to Opposer's own advertising and publicity of TIVO goods, although the record does indicate that TIVO products are sold

---

[40] *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

throughout the United States.[41] Press releases from as early as 2002 tout Opposer's position as the "undisputed leader in television services for digital video recorders"[42] (2002), as a "pioneer in home entertainment"[43] (2005) and as the "ultimate single solution media center"[44] (2011) (calling the TIVO user interface "legendary"). Opposer has also submitted copies of print advertising from 2012 and 2013 for its various TIVO devices, i.e., TIVO ROAMIO, TIVO ROAMIO PLUS, TIVO ROAMIO PRO and TIVO STREAM DVRs.[45] In addition, Opposer regularly attends industry-specific trade shows. The record shows that in 2016 and in 2017, Opposer operated a booth at the Consumer Electronics Show (CES) in Las Vegas, Nevada.[46] As stated by its director of creative services, "[a]nother example [of a trade show attended by Opposer] is CEDIA. And that's more for our custom install customers."[47]

Unsolicited media attention and advertising by third parties may be considered under this factor as well as under factor three, the extent of actual recognition of the mark. We detail such attention under factor three because it is this third-party recognition of the mark that tips the balance in favor of our finding that Opposer's

---

[41] Harrall Decl., 27 TTABVUE 3.

[42] 39 TTABVUE 36. "TiVo, Best Buy Announce Exclusive Agreement To Drive Sales of New TiVo Brand Digital Video Recorder" (March 5, 2002).

[43] *Id.* at 19-20. "Tivo Partners With Microsoft, Sonic, And AMD To Offer Solutions That Extend The TIVOtogo Experience" (January 6, 2005).

[44] *Id.* at 38-40. "TiVo(R) Designed Platform to Launch on Best Buy's Insignia Connected Televisions" (August 1, 2011).

[45] 39 TTABVUE 10-17.

[46] Keane Dep., 35 TTABVUE 31-2.

[47] *Id.*

TIVO mark is famous for dilution purposes. The first factor only somewhat favors a finding that the mark is famous for dilution purposes.

### 2. THE AMOUNT, VOLUME, AND GEOGRAPHIC EXTENT OF SALES OF GOODS OR SERVICES OFFERED UNDER THE MARK.

Currently, the TIVO DVR is available nationwide and in several overseas markets, with Opposer's subscribers numbering 6.8 million as of March 2016.[48] For fiscal years 2011 to 2015, the company generated worldwide revenues of $526 million to $690 million,[49] and its expected worldwide revenue for 2017 was approximately $810 million to $830 million.[50] Opposer currently sells about 6-8 types of TIVO hardware products at retail.[51] Without more context within which to evaluate these figures, however, we consider this factor to be neutral. *See Bose Corp. v. QSC Audio Prods. Inc.*, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002) ("some context in which to place raw statistics is reasonable").

### 3. THE EXTENT OF ACTUAL RECOGNITION OF THE MARK.

"Perhaps the most significant of the four elements set forth in the Act to determine fame is the extent of actual public recognition of the mark as a source-indicator for the goods or services in connection with which it is used." *Nike Inc. v. Maher*, 100 USPQ2d 1018, 1024 (TTAB 2011). Opposer chiefly relies on the extent of actual public recognition of the mark to prove that TIVO is famous; that TIVO acquired its fame

---

[48] Harrall Decl., 27 TTABVUE 3; Opposer's Brief, 47 TTABVUE 23.

[49] *Id.*

[50] *Id.*

[51] Keane Dep., 35 TTABVUE 22.

prior to 2010, the year in which Applicant first used the mark TIVOTAPE; and that it was still famous in 2015 when TIVOBAR was first used. Indeed, the evidence shows that the TIVO mark and name have been referenced in major news and entertainment outlets, and by politicians, and celebrities, since January 2000 to the present. The articles indicate that the TIVO DVR is a well-known, hugely popular programming device for recording television content. For example, in 2008, a Los Angeles Times article referred to TIVO as having "near household-name recognition."[52] A 2009 article in the Tampa Tribune reported that about 34% of American households used a DVR, and that "[i]n a study of TiVo users, the digital video recorder company found six of the seven top season shows that premiered in January received more than half their audiences from people who recorded them."[53] Echoing the continuing popularity of the TIVO DVR, 2010 news articles describe it as an "iconic brand," "revolutionary," and a "pioneer" product.[54] Several articles repeat text from a May 25, 2010 press release:

> TiVo is a leader in advanced television services, including digital video recorders (DVRs), for consumers, content distributors, and consumer electronics manufacturers. …
>
> Since its founding, TiVo has evolved into the ultimate single solution media center … delivering the most dynamic user experience on the market today. TiVo also continues to weave itself into the fabric of the media industry by providing interactive advertising solutions and

---

[52] Alex Pham, "Watch TV evolve, TiVo CEO says," L. A. TIMES, January 21, 2008, 24 TTABVUE 53.

[53] 24 TTABVUE 45. Mullins, "Televisions' Record Numbers," TAMPA TRIB. (March 13, 2009). While the truth of these statements has not been verified, they show the extent to which consumers have been exposed to statements regarding TIVO's notoriety.

[54] 24 TTABVUE 10, 13 and 17.

audience research and measurement ratings services to the television industry.[55]

To further demonstrate TIVO's notoriety, Opposer submitted copies of five "sizzle reels" that contain clips from television shows referencing TIVO digital video recorders.[56] As described by Ms. Harrall, Opposer's director of corporate branding, the five sizzle reels contain:

> media clips identifying major news and entertainment outlets as well as major politicians and celebrities, including as representative examples former President Barack Obama, presidential candidate Hillary Clinton, former Secretary of State Condoleezza Rice, former Secretary of State Colin Powell, Steve Carell, Alyson Hannigan, Hal Sparks, America Ferrera, Spencer Pratt, and celebrity hosts, David Letterman, Carson Daly, Jimmy Kimmel, Ellen DeGeneres, Jimmy Fallon, Larry King, Jay Leno, Jon Stewart, and Stephen Colbert all of whom have referenced TiVo as a famous household name. TiVo is also referenced as a famous household name on some of the most popular American TV shows and feature films, including *South Park, Gilmore Girls, Jersey Boys, Family Guy, Sex and the City, The Big Bang Theory, Entourage, American Idol, The Simpsons, Curb Your Enthusiasm, The Office, The View, The Today Show, Harold and Kumar,* and *Tropic Thunder.*

Each sizzle reel contains numerous media clips. Many of the media clips include a stylized TIVO TALK logo, and each has a subtitle that identifies the speaker and program in which the spoken reference to TIVO was made. Most of these media clips

---

[55] 39 TTABVUE 119-120. "Tivo, Insignia developing connected television for superior, seamless consumer experience" (May 25, 2010).

[56] Keane Dep., 35 TTABVUE 37. "In the course of my work we sometimes make sizzle reels where we grab clips from popular culture and string them together to highlight that the company is well-known and a big part of the culture." *Id.* The sizzle reels are Exhibit A to Harrall's declaration, as bulky exhibits.

are undated, but 18 are dated: one is dated 2005, eleven are from 2006 and six are from 2007. One (undated) clip from 2008 features Hillary Clinton on "The Late Show with David Letterman" stating that the #6 reason she loves America is "TIVO." (excerpt shown below):[57]



The (also undated) clip from the movie "Harold & Kumar Escape from Guantanamo Bay" shows one of the protagonists advising the other, "The first thing you've got to do when you get to America is buy a TIVO."[58]

Further examples from those clips that are dated include the following:

2007: On "Ellen," Anderson Cooper says "Forget the Internet, for me TIVO is the greatest technological revolution." (excerpt shown below):

---

[57] *Id.* The clip can be dated to 2008 because the campaign sign is from her 2008 bid for President and she is addressed as "Senator."

[58] *Id.*



2006: On "The Oprah Winfrey Show," Ms. Winfrey announces to general applause that everyone in the audience will be receiving a TIVO DVR. (excerpt shown below):



2007: The TIVO device itself, and an anthropomorphic logo registered by Opposer, was featured on "The View" with Chris Harrison:



These excerpts demonstrate exposure of the mark TIVO in some of the more popular American television shows during the years 2005-2008.

Opposer further introduced the "Cision Report," a multi-page "media analysis and reporting report[] generated through Cision, a third-party analytics vendor"[59] as evidence TIVO is famous. Authenticating the report, Ms. Harrall testified that

> TiVo historically and regularly monitors its public perception and engagement, including through use of an outside public relations firm(s). Attached as Exhibit B is a true and correct media analysis and reporting reported [sic] generated through Cision, a third-party analytics vendor, outlining and detailing over 30,000 mentions of TiVo in news outlets from January 2000 to April 2009.[60]

Illustrative examples of the "mentions of TiVo" are contained in the following "hits"[61] from the Cision Report.[62]

---

[59] Harrall Decl., 27 TTABVUE 4; Exhibit B.

[60] 27 TTABVUE 4.

[61] Typically, a "hit" contains two or three references to TIVO.

[62] The excerpts reprinted herein have been reproduced in their original form, including typographical errors. Lines not pertaining to TIVO have been deleted to enhance comprehension and where appropriate. Per the Report, "HUT" indicates the households using television in a designated market; DMA% indicates "percentage of US" and TRT stands for "approximate total running time."

**[Hit #] 2407)**[63]
**Tone: N/A Market: San Francisco-Oakland-San Jose. CA [SF] [5] HUT: 2,355,740 DMA%: 2.13**
**Date: 06/24/2007 Time: 01:30AM Aired On: KNTV Affiliate: NBC Show: Tech Now!**
**Estimated Audience Number: 14,123 | Estimated Publicity Value (Per 30 seconds): $639.34**

> 01:31:14.67 We take you behind the scenes of summer blockbuster movies full of the latest technology .. Plus .. What do **TiVo** .. And kevin bacon have in common? And its never too early for cocktails.From the tech museum of innovation in the heart of silicon valley. (TRT=00:39)
>
> 01:36:39.50 And, if you think about it, the most famous acts not yet on itunes, the beatles and radiohead, can now be bought and downloaded, right to your ipod .. And speaking of fame .. Technows scott mcgrew says **TiVo** owners may now have an advantage when playing "six degrees of kevin bacon. " You know the game .. Right? (TRT=00:50)
>
> 01:38:14.26 It gives you a great way to find that. Combine that with broadband and its amazing what you discover. **TiVo** is battling no- name d-v-rs from cable and satellite companies for market share. Generic hard drive recorders tend to be cheaper .. But **TiVo** offers quality and more features. The ease of use its famous for .. The abilty to download t-v shows straight to your ipod .. Or share home movies across the **TiVo** network .. And now .. The ability to be really really good .. At playing the bacon game. Swivel search is free with all series 8 three **TiVos** .. You may already have it and dont realize it .. If you dont (TRT=01:01)
>
> 01:38:58.30 It only works .. Though .. If you have your **TiVo** connected to your broadband .. And not a regular phone line. One of the biggest companies bringing us online entertainment is branching out . (TRT=00:33)

**[Hit #] 163)**[64]
**Tone: N/A Market: Springfield. MO [SG] [77] HUT: 395,820 DMA%: 0.359**
**Date: 05/09/2006 Time: 06:00AM Aired On: KOLR Affiliate: CBS Show: KOLR 10 News This Morning**
**Estimated Audience Number: 13,531 | Estimated Publicity Value (Per 30 seconds): $612.54**

> 06:21:33.33 **TiVo**, the company made famous for allowing television viewers to skip commercials, is now offering a service allowing subscribers to watch hours of ads. "**TiVo** product watch" gives advertisers a chance to reach subscribers with ads and information. Those who opt for the service can watch ads ranging in length from one minute to one hour. (TRT=02:20)

**[Hit #] 1782)**[65]
**Tone: N/A Market: Huntsville-Decatur (Florence). AL [HD] [79] HUT: 399,440 DMA%: 0.34**

---

[63] *Id.* at 2926.

[64] *Id.* at 3487.

[65] *Id.* at 5088.

**Date: 12/17/2004 Time: 10:00PM Aired On: WAAY Affiliate: ABC Show: 31 News Live at 10**
**Estimated Audience Number: 18,812 | Estimated Publicity Value (Per 30 seconds): $851.61**

22:30:57.21 Lots of people lined up today in san jose to get their free **TiVo** . **TiVo** is trying to capitalize on problems comcast is having in california with the rollout of its own digital video recorder in the area. **TiVo** put a full page ad in the san Francisco chronicle announcing it was giving free recorders to comcast subscribers. To get the gift, comcast bill and bring a new toy for
charity. The 40-hour **TiVo** recorder normally costs two hundred dollars. I think the war is the most powerful narcotic. Veteran war correspondent chris hedges has some harsh criticism for his colleagues (TRT=02:00)

**[Hit #] 1791)**[66] **Tone: N/A Market: San Francisco-Oakland-San Jose. CA [SF] [6] HUT: 2,523,520 DMA%: 2.17**
**Date: 12/17/2004 Time: 06:00PM Aired On: KNTV Affiliate: NBC Show: NBC11 News: The Bay Area at 6**
**Estimated Audience Number: 75,917 | Estimated Publicity Value (Per 30 seconds): $3,436.76**

18:10:48.00 And they came by the thousands hoping to get a free **TiVo** . Well take you to the **TiVo** frenzy, were back in two minutes …(TRT=00:25)
18:23:39.43 Big money changing hands, now you can buy a piece of the king, lisa marie presley is selling marketing rights to the elvis estate to a promoter, price tag $100 million. For a lot less money, in fact for nothing you could have snagged one of the holidays hottest gifts today. **TiVo** gave away its products all in the spirit of competition. When neat fills up we need to get the information out front, traffic for those other people. They lined up and camped out all morning. Watch the traffic so we don't have any accidents. Thousands of people waiting not for concert tickets or a flu shot. Just make sure that you get **TiVo** . Reporter: for a free **TiVo** . When did you get here this morning? 4:30 A.m. What were you thinking? Free **TiVo** , period. Great gift. I started when i arrived. You are this far already. Im this far already. Three, two, one! Reporter: **TiVo** , maker of the famous recorder, attracted all these people with this giveaway, brick your comcast cable bill and toy for charity and youll walk away with a free **TiVo** (TRT=01:02)

Contained within the Report are four "report summaries" that cite TIVO mentioned in a total of 14,000 "hits" on radio and television programs. The report summaries attach a dollar value to the media mentions, totaling $213,277,870.36:

Report Summary at 27 TTABVUE 11 --
Total Hits: 5000
Total Audience: 1,704,496,339

---

[66] *Id.* at 5091.

Total Publicity Value: $78,005,020.97

Report Summary at 27 TTABVUE 2419 --
Total Hits: 5000
Total Audience: 2,588,202,775
Total Publicity Value: $117,179,589.90

Report Summary at 27 TTABVUE 5902 --
Total Hits: 2000
Total Audience: 318,121,664
Total Publicity Value: $7,213,584.10

Report Summary at 28 TTABVUE 466 --
Total Hits: 2000
Total Audience: 547,431,920
Total Publicity Value: $10,979,675.39

Based on the evidence, we find that by 2010, the extent of actual recognition of the mark was pervasive and widespread.[67] This factor strongly favors a finding of dilution fame.

### 4. WHETHER THE MARK WAS REGISTERED ON THE PRINCIPAL REGISTER.

Opposer owns a registration for the standard character mark TIVO that issued in 2001 for the DVR product. Opposer also owns a registration for the design mark that issued in 2002. Each mark registered on the Principal Register as an inherently distinctive mark without resort to Section 2(f) or subject to a disclaimer. Moreover, as each is over five years old they are not subject to challenge under Trademark Act § 2(e). Trademark Act § 14(3), 15 U.S.C. § 1064(3).

Accordingly, this factor also favors a finding of dilution fame.

---

[67] Opposer's burden to show that its mark was famous at time of trial is discussed infra.

### 5. CONCLUSION ON FAME

The statute clearly sets forth the requirement that a plaintiff's mark must be famous prior to the date an allegedly dilutive mark is first used by the defendant. Trademark Act Section 43(c)(1); 15 U.S.C. § 1125(c)(1). The evidence of record demonstrates that public recognition of the mark from at least as early as 2002 was widespread and that by 2010, TIVO had become a "household term [with] which almost everyone is familiar." *Toro Co.*, 61 USPQ2d at 1181. Applicant argues, however, that Opposer should be required to establish fame of its TIVO mark by August 11, 1972, because that was the date on which Applicant first began using its TIVOLI mark from which its later TIVO-formative marks are derived.[68] Applicant relies, for its reading of the statutory requirement, on the Board's decision in *Omega SA v. Alpha Phi Omega*, 118 USPQ2d 1289 (TTAB 2016), wherein the Board held that a plaintiff seeking relief under the dilution statute must establish that its mark "became famous prior to any established, continuous use of the defendant's involved mark as a trademark or trade name, and not merely prior to use in association with the specific identified goods or services set forth in a defendant's subject application or registration." *Id.* at 1296. *Omega* recognizes that the statute did not limit the defendant's use of its mark to any specific goods or services, as compared to other sections of the Trademark Act, and that the language in Section 43(c)(1) that provides for an injunction against another's use of a mark that commenced after the owner's mark has become famous is not focused on the nature of the defendant's use for

---

[68] 49 TTABVUE 23.

particular goods or services. In other words, the key date for determining whether a plaintiff's mark became famous for dilution purposes is the date when a defendant's first use of the involved mark began, whether as a trademark on or in connection with any goods or services or as a trade name. But the "involved" mark may not change over time; in order for the defendant to "tack" on its earlier use, the mark must be essentially the same at the time it is first used as at the time when it is used in association with the goods or services identified in the subject application or registration. In *Omega*, the defendant's marks did not change over time, and we decline to expand the *Omega* holding to encompass use of a different mark, such as we have in each of these cases.

Even if we were to allow Applicant to rely on prior use of a mark other than TIVOTAPE or TIVOBAR, such mark would have to be essentially the same, or "legally equivalent" to these marks. However, none of Applicant's other TIVO-formative marks are legal equivalents to either TIVOTAPE or TIVOBAR, and for that reason alone, "tacking" would be denied. *See Hana Financial*, 113 USPQ2d at 1367 ("This term [legal equivalents] refers to two marks that create the same, continuing commercial impression so that consumers consider both as the same mark.") (internal quotation marks omitted); *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001); *Van Dyne-Crotty Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 17 USPQ2d 1866 (Fed. Cir. 1991).

We have also considered whether a plaintiff alleging dilution must further show that its mark is still famous at trial, when defendant's rights are being determined.

Section 43(c)(1) of the statute provides relief to "the owner of a famous mark." We have encountered no precedent, and the parties have cited no precedent, addressing the additional inquiry of whether a plaintiff's mark must remain famous until trial in order for the plaintiff to prevail. In making our determination that such an additional requirement exists, we draw upon the language of the statute itself.

To establish fame for dilution purposes, a plaintiff must show that its mark "**is** widely recognized by the general consuming public in the United States." Trademark Act § 43(c)(2)(A); 15 U.S.C. § 1125(c)(2)(A) (emphasis supplied). In addition, Section 43(c)(1), 15 U.S.C. § 1125(c)(1), permits only the "owner of a famous mark that is distinctive, inherently or through acquired distinctiveness" to bring a claim. Accordingly, unless the plaintiff owns a famous mark at the time it brings the claim, and by extension, retains its fame through trial, this provision of the statute cannot be satisfied. Thus, a rational reading of the statute compels us to inquire into the continuing status of a mark asserted under a Section 43(c) claim and to hold that it is capable of being diluted within the meaning of the statute only if it is famous at the time the claim is adjudicated. To find otherwise would allow a mark that has lost its fame to continue to enjoy the widest penumbra of protection available accorded by the extraordinary protection of the dilution statute. This approach also accounts for any significant changes in the marketplace between the date of Applicant's first use of its mark and trial.

Our decision in *Research in Motion Ltd. v. Defining Presence Marketing Group Inc.*, 102 USPQ2d 1187, 1197 (TTAB 2012), suggests that a plaintiff asserting dilution

must establish its fame at the time of trial. There, the Board first considered the opposer's Section 2(d) claim that its mark BLACKBERRY had become famous a decade after opposer had first used the mark [in 1999] for a handheld "smart phone." The Board found that the BLACKBERRY mark had become famous for likelihood of confusion purposes by "mid-decade" [i.e., 2006] and inferred that it remained so at trial [held in 2011]. *Id.* at 1193. Turning next to the issue of fame under opposer's dilution claim, the Board first noted the higher standard of fame "required in the analysis of likelihood of dilution than is the case with fame in terms of likelihood of confusion." *Id.* at 1197. Mindful of this higher standard, but perhaps also in light of Applicant's concession of the fame of opposer's mark, the Board found that "Opposer's consistent history and tremendous volume of U.S. advertising and sales figures, coupled with the additional factors discussed above, supports the finding that BLACKBERRY has become a 'household name' and *is* famous for dilution purposes." *Id.* (emphasis supplied). We now explicitly hold what we previously implicitly held in *Research in Motion*: that, in addition to proving that its mark became famous prior to the date when the defendant first used the challenged mark, a plaintiff asserting dilution must also prove that its mark remains famous at the time of trial.[69]

---

[69] By analogy, the Board makes a determination based on the factual situation as of the time of trial for other claims that measure consumer perception. *See, e.g.*, *In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) (inherent distinctiveness); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1730 (Fed. Cir. 2012) (secondary meaning); *Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1763 (TTAB 2013) (Fed. Cir. 2014) (genericism); *Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1416 (TTAB 2008) (likelihood of confusion). *See also Gen. Foods Corp. v. MGD Partners*, 224 USPQ 479, 486 (TTAB 1984) (the right to register is determined "on the basis of the factual situation at the time registration is under consideration, including during and throughout the pendency of ex parte and inter parte proceedings in which the mark may be

Here, we find that Opposer's mark TIVO was, for dilution purposes, both famous as of 2010 and famous now. Public recognition of the TIVO mark from at least as early as 2002 was so widespread that by 2010, TIVO had become a "household term [with] which almost everyone is familiar." *Toro Co.*, 61 USPQ2d at 1181. While the majority of Opposer's evidence is from the years before 2010, in 2013, the online magazine "Celebitchy" posted an article about a celebrity marriage that playfully inquired whether "Kerry and Nnamdi spend weekends in bed, reading the New York Times and watching Tivo'd episodes of Frontline."[70] In 2014, the Hollywood Reporter identified the "top 5 TiVo Moments" from the Golden Globes that "had viewers grabbing the remote to find out what happened."[71] As previously noted, from 2011 to 2015, the company generated worldwide revenues of $526 million to $690 million, its expected worldwide revenue for 2017 was approximately $810 million to $830 million, and subscribers numbered 6.8 million as of March 2016.[72] The expansion of the DVR product line under the TIVO ROAMIO mark exemplifies continued commercial value of Opposer's primary TIVO mark.

---

involved"). *Cf. Hornby*, 87 USPQ2d at 1416 (proof of plaintiff's fame or reputation under Section 2(a) determined as of the time defendant's registration issued, although subsequent activities may impact determination as of that date).

[70] Kaiser, "Kerry Washington secretly married football player Nnamdi Asomugha in Idaho," celebitchy.com (July 4, 2013).

[71] "Golden Globes: Top 5 TiVo Moments (Video)," hollywoodreporter.com (January 13, 2014).

[72] The probative value of these figures is reduced because they include foreign revenue and subscribers. Opposer did not itemize its sales or subscriber numbers by product or by territory, and as Opposer's counsel acknowledged during the oral hearing, the percentage of U.S. sales is not of record. Nonetheless, the figures corroborate the continuing public awareness of TIVO within the United States from 2011 to trial.

Showing its enduring fame, in 2017 a columnist from the New York Times stated "[B]ut I'm still most loyal to my TiVo DVR – I've had one almost since they went on the market in 1999. . . . TiVo still has a far better interface than any cable company set-top box I've encountered."[73] Also in 2017, several articles in major news sources reported that President Trump credits the TIVO DVR as "one of the great inventions of all time," and that he "has boasted to several advisers and friends about having 'the world's best TiVo.'"[74] Accordingly, based on the evidence of intense media attention and public recognition of the mark across a wide demographic spectrum for nearly two decades, and corroborated by Opposer's advertising, publicity, and ownership of TIVO and TIVO ROAMIO registrations for DVR products, we find that TIVO was a famous mark within the meaning of Section 43(c) by the time Applicant began using its TIVOTAPE mark on May 30, 2010, and its TIVOBAR mark in 2015, and that it remained famous at the time of trial. *Cf. Hornby v. TJX Co.*, 87 USPQ2d 1411 (TTAB 2008) (petitioner that had abandoned use in the United States of her personal name mark (TWIGGY) prior to date of defendant's first use of its mark was unable to prevail on dilution claim); *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1745, (TTAB 2014) (dilution does not lie where opposer cannot prove that its mark became famous prior to applicant's filing date despite showing of post-filing date fame).

---

[73] James Poniewozik, "Why I still Love TiVo and How a Sous Vide Gadget Rescued Me," N.Y. TIMES, February 15, 2017, 24 TTABVUE 82.

[74] Ashley Parker, "Everyone tunes in: Inside Trump's obsession with cable TV," WASHINGTON POST, April 23, 2017, 24 TTABVUE 85.

Having determined that Opposer's mark became famous prior to Applicant's dates of use of its TIVOTAPE and TIVOBAR marks and that we can infer from the post-2010 evidence that the TIVO mark remained so at trial, we turn to the remaining factors for federal trademark dilution under Section 43(c) of the Trademark Act.

### B. IS OPPOSER'S FAMOUS MARK DISTINCTIVE?

Along the spectrum of distinctiveness, TIVO is at a minimum inherently distinctive, and possibly even fanciful, because it is not a defined term or even a misspelling of a defined term. *In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1684 (Fed. Cir. 2010) ("Word marks that are arbitrary, fanciful, or suggestive are inherently distinctive."). There is neither evidence nor argument to support a contrary finding.

### C. IS APPLICANT USING A MARK IN COMMERCE THAT ALLEGEDLY DILUTES OPPOSER'S FAMOUS MARK?

Applicant's marks TIVOTAPE and TIVOBAR are not identical or nearly identical to Opposer's TIVO mark. Nonetheless, in analyzing whether Applicant's marks dilute Opposer's TIVO mark by blurring, we compare their similarity; the marks do not have to be identical or nearly identical. *Nike*, 100 USPQ2d at 1030 ("The harm dilution does to the selling power of a mark is not only caused by a third-party use or registration of an identical mark. It may be caused by a "look-alike" mark, one that is close enough to the famous mark that consumers will recall the famous mark and be reminded of it...."). We compare the marks fully below under the similarity factor for dilution by blurring.

### D. WAS APPLICANT'S FIRST USE AFTER OPPOSER'S MARK BECAME FAMOUS?

Opposer's TIVO mark was famous before Applicant's claimed first use of its TIVOTAPE (May 30, 2010) and TIVOBAR (2015) marks.

### E. WILL APPLICANT'S USE OF ITS MARK CAUSE DILUTION BY BLURRING?

We now address the question of whether there is a likelihood of dilution by blurring, that is, whether the association arising from the similarity of the parties' marks impairs the distinctiveness of Opposer's famous mark under Trademark Act § 43(c)(2)(B). We must determine not only whether there is an "association" arising from the similarity of the marks, but whether such association is likely to "impair" the distinctiveness of the famous mark. 15 U.S.C. § 1125(c)(2)(B).

In determining whether a mark or trade name is likely to cause dilution by blurring, the Board may consider all relevant factors, including the following:

> (i) The degree of similarity between the mark or trade name and the famous mark.
>
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
>
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
>
> (iv) The degree of recognition of the famous mark.
>
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
>
> (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(B)(i)-(vi).

## 1. THE DEGREE OF SIMILARITY BETWEEN THE MARKS.

In the dilution context, "the similarity between the famous mark and the allegedly blurring mark need not be substantial in order for the dilution by blurring claim to succeed." *Nike v. Maher*, 100 USPQ2d at 1029 (citing *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 111 n. 18, 94 USPQ2d 1188, 1201 n. 18 (2d Cir. 2010)). As noted above, in determining the similarity or dissimilarity of the marks, "we will use the same test as for determining the similarity or dissimilarity of the marks in the likelihood of confusion analysis, that is, the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *Id.* at 1030. "While we are not concerned in this context with whether a likelihood of confusion exists, we still consider the marks, not on the basis of a side-by-side comparison, but rather in terms of whether the marks are sufficiently similar in their overall commercial impressions that the required association exists." *Id.*

Applicant's TIVO-formative marks (TIVOTAPE and TIVOBAR) are similar to Opposer's TIVO mark in appearance and pronunciation due to the shared term "TIVO" in each mark. This term has no meaning, in connection with Applicant's goods, other than as a source-indicator. It is also the first portion and the common element in Applicant's marks, and forms the entirety of Opposer's mark.

Marks have frequently been found to be similar where one mark incorporates the entirety of another mark, as is the case here. *Coca-Cola Bottling Co. v. Joseph E. Seagram and Sons, Inc.*, 526 F.2d 556, 188 USPQ 105, 106 (CCPA 1975) (BENGAL is similar to BENGAL LANCER); *Johnson Publ'g Co. v. Int'l Dev. Ltd.*, 221 USPQ

155, 156 (TTAB 1982) (EBONY is similar to EBONY DRUM); *In re S. Bend Toy Mfg. Co.*, 218 USPQ 479, 480 (TTAB 1983) (LIL' LADY BUG is similar to LITTLE LADY). As the first portion of Applicant's marks, the term TIVO is more likely to be recognized and impressed upon a consumer than the suffixes "TAPE" and "BAR." *See Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992) (upon encountering the marks, consumers will first notice the identical lead word); *Presto Prods. Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered"). As Applicant has explained, the terms "TAPE" and "BAR" describe the shape of the lighting products identified by the respective marks.[75] The term "TIVO," on the other hand, has no meaning other than as a mark.[76]

While we must consider Applicant's marks as the public views them, that is, in their entireties, one feature of a mark may make a greater impression on the public's awareness than another portion, and thus for rational reasons, we may consider that dominant portion to be more significant than another. It is not improper to give more weight to this dominant feature in determining the commercial impression created

---

[75] 36 TTABVUE 30; 25 TTABVUE 29.

[76] From Mr. Keane's deposition: "The story I've heard is TiVo originally from the -- again, this is called company folklore – TiVo has TV in it and the I and O started out as a one and zero. Just playing around with the name, it became TiVo." 35 TTABVUE 22. Applicant argues that consumers will recognize the "tivo" portion of its marks as a contraction of "Tivoli," but Applicant has not supported its assertion with evidence or testimony other than with copies of its registrations and online ads for several TIVO-formative marks. This evidence sheds no light on whether consumers perceive the marks as contractions for "Tivoli."

by the mark. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("There is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable."). Here, we find that consumers are less likely to focus on the descriptive portions of Applicant's marks and instead would regard the first distinctive term TIVO as dominating the commercial impression conveyed by Applicant's marks. *See, e.g.*, *In re Chatam Int'l. Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1946 (Fed. Cir. 2004) (finding descriptive term "offering little to alter the commercial impression of the mark"); *Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1846 (the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") (quoting *Nat'l Data*, 224 USPQ at 752).

Balancing both the similarities and differences between the marks, we find that Applicant's marks TIVOTAPE and TIVOBAR are sufficiently similar to Opposer's mark TIVO to "trigger consumers to conjure up" Opposer's famous mark and associate Applicant's marks with Opposer's mark. *Nike*, 100 USPQ2d at 1030; *Nat'l Pork Bd. v. Supreme Lobster and Seafood Co.*, 96 USPQ2d 1479, 1497 (TTAB 2010). This dilution factor favors Opposer.

## 2. THE DEGREE OF DISTINCTIVENESS OF THE FAMOUS MARK.

To prevail on its dilution claim, Opposer must establish that its mark is not only famous, but distinctive. Distinctiveness for dilution purposes requires that the famous mark be "so distinctive that the public would associate the term with the

owner of the famous mark even when it encounters the term apart from the owner's goods or services, i.e., devoid of its trademark context." *Chanel, Inc. v. Makarczyk*, 110 USPQ2d 2013, 2019 (TTAB 2014) (citing *Toro Co.*, 61 USPQ2d at 1177); *see also Coach Services*, 101 USPQ2d at 1723-24.

As noted supra, TIVO is inherently distinctive in connection with Opposer's listed goods and services. Moreover, Opposer has met its burden in demonstrating that the relevant public recognizes the mark TIVO as signifying a "unique, singular, or particular source." *Toro Co.*, 61 USPQ2d at 1184. This dilution factor favors Opposer.

### 3. THE EXTENT TO WHICH THE OWNER OF THE FAMOUS MARK IS ENGAGING IN SUBSTANTIALLY EXCLUSIVE USE OF THE MARK.

On this record, Opposer has shown that it engages in substantially exclusive use of the mark TIVO with respect to competitive, as well as non-competitive goods and services. The evidence does not show the term TIVO alone used as a mark by others. While Applicant submitted 84 third-party registrations for TIVO-formative marks, arguing that this shows that Opposer's mark is weak, the evidence is unpersuasive. First, 41 of the registrations have been cancelled. A cancelled or expired registration is "only evidence that the registration issued and does not afford . . . any legal presumptions under [Section] 7(b)." *Action Temp. Servs. Inc. v. Labor Force Inc.*, 870 F.2d 1563, 1566, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989) ("[A] canceled registration does not provide constructive notice of anything."); *In re Pedersen*, 109 USPQ2d 1185, 1197 (TTAB 2013) (statutory benefits of registration disappear when the registration

is cancelled). Consistent with well-established decisional law, the cancelled registrations submitted by Applicant have little, if any, probative value.

Secondly, of the remaining 43 third-party registrations, none of the marks create a commercial impression similar to the TIVO mark. None are for TIVO alone; the majority are for the mark TIVOLI. Others combine TIVO with a suffix that completely changes the commercial impression of the mark, as in, e.g., TIVORBEX, while others substitute the letters "TE" for the initial "TI" (TEVOLIO, TEVORAK, TEVOLUTION) in the mark or utilize a different vowel after the letter "V" (TIVIT, TIVICAY, TIVACTION). The one single-term mark that arguably sounds like TIVO (i.e., TEVO) is insufficient to show that the term TIVO is in common parlance or is weak. Applicant's argument that its marks also show weakness of Opposer's mark is also unpersuasive because they are not for TIVO alone and too few in number to show that Opposer's use is not substantially exclusive.

Significantly, Applicant did not submit evidence that any of the third-party marks are in use. Third-party registrations are not evidence that the marks shown therein are in use, or that the public is familiar with them. *Conde Naste Publ'ns, Inc. v. Miss Quality, Inc.*, 507 F.2d 1404, 184 USPQ 422, 424-25 (CCPA 1975); *Jansen Enters. Inc. v. Rind*, 85 USPQ2d 1104, 1110 (TTAB 2007). Thus, to the extent that Applicant has attempted to show that Opposer's use of its TIVO mark is not substantially exclusive, these registrations are not probative and this dilution factor favors Opposer.

### 4. THE DEGREE OF RECOGNITION OF THE FAMOUS MARK.

Although we have determined that the mark TIVO is a famous mark for dilution purposes and that it meets the stringent requirements for dilution fame, the statute requires us to further consider the degree of the famous mark's recognition. This factor requires a determination as to the level of fame, which we approach from the perspective of a sliding scale; the likelihood of an association between the famous mark and the defendant's mark thus becomes proportional to the extent of the mark's fame. Here, the majority of Opposer's evidence is from the years before 2010, and while it is consistent with a finding that the fame of Opposer's mark TIVO has continued to the present, we infer that the degree of consumer recognition has somewhat weakened over time. Nevertheless, Opposer currently sells TIVO digital video recorders, there is an ongoing public association of the mark and Opposer's use of TIVO ROAMIO shows the continuing utility of the DVR product and continuing recognition of the famous TIVO mark.

On balance, we find the mark TIVO is publically associated with Opposer's digital video recorders such that it "is now primarily associated with the owner of the mark even when it is considered outside of the context of the owner's goods and services." *Toro Co.*, 61 USPQ2d at 1180-81. "When the public encounters [the TIVO] mark in almost any context, it associates the term, at least initially, with [opposer]."*Id.* at 1181. Accordingly, the factor concerning the degree of recognition of the famous mark favors a finding of dilution by blurring.

**5.     WHETHER THE USER OF THE MARK OR TRADE NAME INTENDED TO CREATE AN ASSOCIATION WITH THE FAMOUS MARK.**

There is no evidence that suggests that Applicant intended to create an association with Opposer's TIVO mark. In view thereof, this dilution factor is neutral.

**6.     ANY ACTUAL ASSOCIATION BETWEEN THE MARK OR TRADE NAME AND THE FAMOUS MARK.**

There is no evidence of actual public association between Applicant's TIVOTAPE and TIVOBAR marks and Opposer's TIVO mark. Given that the marks TIVOTAPE and TIVO have been in concurrent use for more than eight years, this dilution factor favors Applicant.

## V.     CONCLUSION ON DILUTION BY BLURRING

Opposer's mark TIVO became famous prior to Applicant's first use of its marks, and remains famous and inherently distinctive. It is sufficiently similar to TIVOTAPE and TIVOBAR that an association between the parties' marks likely to impair the distinctiveness of Opposer's famous mark is established. The somewhat lesser degree of recognition that TIVO may enjoy at present, and the fact that there is no evidence of actual association between the marks and none was intended by Applicant do not outweigh the other dilution factors. Inasmuch as the dilution doctrine was designed to provide a remedy where the goods or services involved are neither competitive nor necessarily related, *Nike*, 100 USPQ2d at 1031, the fact that the parties' goods and services are not related does not obviate Opposer's dilution claim.

Viewing the evidence as a whole, we conclude that Applicant's TIVOTAPE and TIVOBAR marks are likely to dilute the distinctive quality of Opposer's famous TIVO mark.

**DECISION**: The opposition is sustained as to both of Applicant's applications pursuant to Opposer's dilution by blurring claim under Trademark Act § 43(c)(2)(B), 15 U.S.C. § 1125(c)(2)(B). Because we have found for Opposer on its dilution claim, we need not reach the merits of its claim under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d). *See N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 1512 (TTAB 2015).